# CASES

## SECOND DISTRICT

OF THE

# APPELLATE COURT OF ILLINOIS

### DURING THE YEAR 1906.

---

## Caroline Roth, et al., v. Arthur W. Burnham, et al.

### Gen. No. 4,565.

1. LEAVE TO AMEND—*when becomes effective.* Leave to amend is not effective until the amendment is actually made.

2. PARTIES—*who not necessary, to a proceeding in chancery.* Persons having no substantial interest in the subject-matter of the litigation are not necessary parties to a bill in chancery.

3. WRIT OF ERROR—*when question of parties to, deemed waived.* A defect with respect to parties to a writ of error, where not early called to the attention of the Appellate Court, may be deemed waived.

4. EXECUTION SALE—*when properly set aside.* Held, under the evidence in this case, that a decree setting aside an execution sale at the instance of creditors whose interests were impaired by the inflation of a claim used for purposes of redemption, was proper.

Bill to set aside execution sale. Error to the Circuit Court of Lake County; the Hon. CHARLES H. DONNELLY, Judge, presiding. Heard in this court at the October term, 1905. Affirmed. Opinion filed April 20, 1906.

McDOUGALL & CHAPMAN and F. H. NOVAK, for plaintiffs in error.

FAYETTE S. MUNRO, for defendants in error; A. J. MULLEN, of counsel.

MR. JUSTICE DIBELL delivered the opinion of the court.

This writ of error assails a decree entered in a cause

(222)

wherein Arthur W. Burnham and others, judgment cred-
itors and assignees of judgment creditors of the Winthrop
Harbor and Dock Company, were complainants, and Caro-
line Roth, William C. Heinroth, H. Martin, Joseph Husak,
Lawrence C. Moore, William D. Cravens, F. H. Novak and
George N. Powell, sheriff of Lake County, were defend-
ants. The bill alleged that in a redemption and resale of
real estate in Lake county owned by the Winthrop Harbor
and Dock Company, hereinafter called the harbor company,
a judgment obtained by Caroline Roth against said harbor
company was used for a sum very much larger than was
then due thereon, the same having been mostly satisfied
before that time; and it also charged that such use of said
judgment by the defendants was fraudulent. At the hear-
ing complainants had a decree, substantially in accord with
the allegations and prayer of the bill, by which a certain
execution sale was set aside, the amount of said judgment
materially reduced, and a resale ordered by the master,
with the proceeds of which the court provided for adjust-
ing matters between the parties interested. This is a writ
of error sued out by certain of the defendants to review that
decree. Husak, Moore, Cravens and Powell were not made
either plaintiffs or defendants in error. Defendants in
error moved to dismiss the writ of error for non-joinder of
necessary parties. The suggestion filed with said motion
contended that Husak and Moore were necessary parties to
the writ of error, but no reference was therein made to
Cravens or Powell. Plaintiffs in error then asked leave to
join Husak and Moore as plaintiffs in error, and for leave
to amend the record accordingly. This motion was granted,
and the motion to dismiss was denied. No amendment,
however, was in fact made. Leave to amend is not effec-
tive till the amendment is actually made. Condon v.
Schoenfeld, 214 Ill. 226; Landt v. McCullough, 206 Ill. 214.
The assignments of error are only by Mrs. Roth, Heinroth,
Martin and Novak. No order to sever the plaintiffs in error
was obtained, and Husak and Moore were not summoned;
and it may well be doubted whether we ought to proceed

further, under the principles announced in McIntyre v.
Sholty, 139 Ill. 171; Cooke v. Cooke, 194 Ill. 225; Granat
v. Kruse, 213 Ill. 328; Scott v. Great Western Coal Co., 220
Ill. 42; and Fraser v. Fraser, 110 Ill. App. 619.  In written
*addenda* to their brief defendants in error call attention to
these omissions, and also insist that the writ of error should
be dismissed because Cravens is not made a plaintiff in
error.   Cravens only bought and again transferred a judg-
ment.   He was the servant through whom it was alleged
that Heinroth conducted some of the transactions.   No re-
lief was sought against Cravens.   The decree found that
Cravens was not a party to the conspiracy or fraud alleged
in the bill and ordered that no relief of any kind or decree
for costs be granted against him; and that pursuant to his
agreement in open court no costs or damages were claimed
by or awarded to him.   There was a like decree as to the
sheriff, Powell, except as to the injunction against a sheriff's
sale under the execution on the judgment obtained by the
Illinois Brick Company.   Cravens and Powell seem, there-
fore, to have no substantial interest.   Defendants in error
did not by any motion call attention to the failure of the
original plaintiffs in error to have Husak and Moore join
in error, or to obtain an order of severance, and summon
them.   If such a motion had been made, plaintiffs in error
could have remedied the defect.   This condition of the rec-
ord did not fully come to our attention till after we had
completed our investigation of the other questions involved,
and we have accordingly concluded to treat these defects
as waived.

The very voluminous record here presented contains a
mass of legal proceedings had in other causes, in the Circuit
and Superior Courts of Cook County and the Circuit Court
of Lake County, Illinois, and the Circuit Court of Kenosha
County, Wisconsin.   We shall state only those matters
which seem to us to bear upon the questions presented for
decision.   The harbor company was the owner of the real
estate described in the bill.   On December 8, 1893, it exe-
cuted a note for $10,000, and secured the same by a trust

deed upon said premises.  William Jones became the owner
of the note, and filed a bill in the Circuit Court of Lake
County to foreclose the trust deed and obtained a decree,
and there was a sale of the premises, and Jones purchased
and received a certificate entitling him to a deed, unless re-
demption from said sale was made on or before August 14,
1903.  On November 26, 1900, the harbor company exe-
cuted twenty-nine promissory notes, for the total sum of
$17,500, each dated on that day, and payable on or before
the first day of March, 1901, with interest at six per cent.
per annum after date; twenty-eight of said notes being for
the principal sum of $600 each, and one for the sum of
$700.  These notes were secured by a trust deed on other
premises, already incumbered to secure an indebtedness
which became the property of Mrs. Louisa W. Foley.  The
notes of November 26, 1900, afterwards became the prop-
erty of Mrs. Caroline Roth.  She brought an action in at-
tachment in the Circuit Court of Kenosha County, Wiscon-
sin, against the harbor company, and on March 12, 1903,
obtained a judgment for $5,497.55, and had an execution,
which was returned June 20, 1903, fully satisfied, and the
amount due the judgment creditor paid.  On the 30th
day of March, 1903, Caroline Roth recovered a judgment
in the Superior Court of Cook County against the harbor
company for $14,486.45 and costs.  On June 15, 1903, a tran-
script of said judgment was filed in the Circuit Court of
Lake County.  An execution thereon was then issued from
the Circuit Court of Lake County on June 18, 1903.  On
August 13, 1903, Mrs. Roth or some one for her, or using
her name for that purpose, paid the sheriff of Lake county
$12,330.35 to redeem from the sale under the Jones decree,
being the sum required to effect such redemption, and the
sheriff then levied the Roth execution on the same prem-
ises, and advertised them for sale on September 5, 1903.
Mrs. Roth thereafter sold and assigned said judgment to
Joseph Husak, and the assignment was filed for record in
Lake county, just prior to the sheriff's sale here in question.
In a certain other foreclosure suit in the Circuit Court of

Lake County, brought by Mrs. Foley, and in which Mrs. Roth was a defendant, a decree was rendered which found the harbor company indebted to Caroline Roth in a certain sum, and under a sale had in that case she was paid $11,206.83. It is the claim of the complainants in this suit that all of said judicial decisions in favor of Mrs. Roth were on said promissory notes of November 26, 1900, and that by the sums made in the proceeding in Kenosha county, Wisconsin, and in the Foley foreclosure suit, and paid to Mrs. Roth, she received all that was her due, except less than $2,500. In redeeming from the Jones sale, and causing the premises to be re-advertised, the Roth execution was used as equivalent to $14,486.45, with interest thereon, instead of less than $2,500 which it is alleged was still unpaid thereon. The result was greatly to increase the amount which complainants, later judgment and execution creditors, most of whose judgments were for comparatively small sums, would he obliged to pay, in order to redeem from such sale and protect their executions. Plaintiffs in error contend, though somewhat feebly, that it is not here proved that all these judicial awards in favor of Mrs. Roth were upon said notes of November 26, 1900, and the correctness of the decree on that subject is the first question for consideration.

The proof shows that on November 26, 1900, the Winthrop Harbor and Dock Company became indebted to the Western Telephone Construction Company in the sum of $17,500 upon a contract then made between the two companies, and that to evidence that indebtedness the harbor company executed twenty-eight notes for $600 each and one note for $700, dated November 26, 1900, and due on or before March 1, 1901, with interest at six per cent. per annum after date, and payable to the order of itself, and that it indorsed and delivered said notes to the Western Telephone Construction Company, and that the Western Telephone Construction Company afterwards indorsed and delivered them to Mrs. Roth. The oral proof shows that these were the only notes of that date executed by the

harbor company, and the only notes ever indorsed by it to the Western Telephone Construction Company. These notes seem not to have been numbered. In the suit brought by Mrs. Roth against the harbor company in the Circuit Court of Kenosha County, Wisconsin, the amended complaint counted upon eight promissory notes, each dated November 26, 1900, each due on or before March 1, 1901, each for $600, with interest at six per cent. per annum after date, each payable to the order of itself, and each indorsed and delivered by it to the Western Telephone Construction Company, and each indorsed by said construction company to plaintiff, being $4,800 of principal, besides interest; and in that suit Mrs. Roth had a judgment for $5,497.55, being the entire amount due on said eight notes, which, with accruing interest, was satisfied on execution. In the suit brought by Mrs. Roth against the harbor company in the Superior Court of Cook County, her declaration counted on twenty notes, each dated November 26, 1900, each for $600, each due March 1, 1901, each bearing interest at six per cent. per annum after date, each indorsed and delivered to the Western Telephone Construction Company, and each by the construction company indorsed to the plaintiff, and also on one note of $700 of the same date, and in every other respect of the same tenor. Upon these notes Mrs. Roth had the judgment already described for $14,486.45, on March 20, 1903. It will therefore be seen that in these two actions at law Mrs. Roth recovered judgments for the entire amount of the principal and interest of all the twenty-nine notes the harbor company executed and delivered to the construction company on November 26, 1900. In the Foley foreclosure suit in the Circuit Court of Lake County, the answer of Mrs. Roth set up the same twenty-nine notes, and described them in substantially the same manner, but it was averred that one note for $600 had been paid, and that $300 of principal had been paid upon another of said $600 notes, on June 15, 1901. In the master's report of proofs and conclusions in that Foley case, he found that Mrs. Roth owned twenty-seven

notes for $600 each, each dated November 26, 1900, and due on or before March 1, 1901, with interest at six per cent. per annum after date, made by the harbor company and by it indorsed, on one of which $300 was indorsed as paid on the principal on June 15, 1901, and that she also owned one note of like tenor, except that it was for $700, and that there was due Mrs. Roth upon said notes $18,951.16. This report was dated March 23, 1903, and covered all said notes except the one that had been paid in full. The decree in the Foley case was entered on April 6, 1903. It found Mrs. Roth the owner of the same notes described in the master's report, and that there was due her thereon $18,951.16. The premises were sold under that decree in May, 1903. On October 7, 1903, an order was entered in that case, showing that the master had made and reported a sale of the premises described in that decree, satisfying not only the Foley estate, but also satisfying Mrs. Roth's claim to the amount of $11,206.83, and that sale and distribution was then approved.

We regard it, therefore, as clearly established that the suit brought by Mrs. Roth against the harbor company in Kenosha county, Wisconsin, was upon eight of the promissory notes executed November 26, 1900, by the harbor company, and that the suit brought by her against the harbor company in the Superior Court of Cook County was upon the remainder of said notes, twenty-one in number, and that the decree in her favor in the Foley foreclosure suit was upon the same notes, except the one that had been paid, and that the amount realized upon execution in the Kenosha Circuit Court and the amount realized by her at the master's sale in the Lake Circuit Court satisfied all her claims against the harbor company upon said notes except a small sum, which the court below, by the decree in this case, found amounted to $2,297.60 on September 5, 1903, and the correctness of that computation is not questioned here. It follows that the use of that judgment in the attempted redemption from the Jones sale and resale of the premises at the sum of $14,486.45 with interest, was un-

warranted, and was a substantial wrong done to the later judgment creditors who filed this bill.

Was the use of this judgment at an inflated sum for the purpose of redemption a mere mistake, or was it an intended fraud upon the later and smaller judgment creditors who filed this bill? Fraud, of course, is seldom proved by the direct testimony of persons who swear that a fraudulent plan was devised and carried out, but it rests upon facts and circumstances of a peculiar character which usually surround a fraudulent transaction. Heinroth was treasurer and director of the harbor company when these notes were given to the Western Telephone Construction Company, and was present at the meeting at which the issue of these notes to the construction company was authorized and he voted for the proposition. He was also an officer of the construction company when it obtained money from Mrs. Roth on these notes, and he transferred the notes to her. Heinroth was also a nephew of Mrs. Roth, and was her agent in the transaction of her business affairs. Mrs. Roth was over seventy years of age, and evidently did not transact her own business, and at the time of this trial she was in California for her health. Novak was an attorney. There was much evidence pro and con as to his general reputation for truth and veracity. Novak and Cravens occupied room in Heinroth's office, and Cravens paid no rent. Cravens was a stockholder in the harbor company. Heinroth became the receiver for the harbor company, when a receiver was appointed in other litigation. Heinroth directly or indirectly bought one or more other judgments against the harbor company, and he took assignments thereof and turned them over to Novak, who purported to represent Martin. Novak paid therefor. Husak was a merchant tailor. He had never been in Waukegan before the day of the sale hereinafter mentioned, and there is nothing to indicate that he had any knowledge of the harbor company, or that he was searching for an opportunity to invest in such property. Novak transacted legal business for Mrs. Roth. Papers are in the record signed

by him as her attorney. Heinroth had a sister Luella Heinroth, a niece of Mrs. Roth. She loaned money through Heinroth and Novak to the people who were redeeming this property for each of the two redemptions herein described. Novak acted as her attorney. Mrs. Foley, in whose name the Foley foreclosure suit was started, was the mother-in-law of Heinroth, and his wife seems to have been one of the executors substituted as complainants after Mrs. Foley died during the pendency of that suit. Fairfield, an attorney, testified that Novak brought it about that Mrs. Roth consented to allow Fairfield to enter her appearance in this case, and consented that Novak should represent Fairfield in representing her. It seems that Heinroth and Novak attended the sale at Kenosha under Mrs. Roth's judgment, and that one of them bought in the property there sold under that execution, making the purchase in the name of a relative of Novak, and they must have known that that sale paid Mrs. Roth in full for that judgment in Kenosha. Heinroth was a party to the Foley foreclosure suit and knew that Mrs. Roth was also a party thereto. Novak sent for Husak, for whom he had done some legal business, and persuaded Husak to take an assignment of Mrs. Roth's judgment in the Superior Court of Cook County. Novak told Husak it would be safe to invest his money in it, and that he would either get his money back or that he would get the property; and Husak understood that he would make at least $1,000 in the transaction. Novak prepared a written proposition to Mrs. Roth, and induced Husak to sign it. In that paper Husak offered that for an assignment of said judgment he would pay Mrs. Roth $2,000 in cash, and would pay the interest on $12,330.35 at six per cent. (which was the amount deposited to redeem from the Jones sale), and that if he obtained a deed for the property covered by her certificate, he would pay her that sum within five years, with interest at six per cent., secured on the property, and if he did not obtain a deed, he would pay her $12,330.35 within thirty days after sale under the redemption, with interest at six per cent. That proposition was dated

August 25, 1903. She accepted the proposition and executed an assignment to him under date of August 31, 1903, and Husak paid Novak $2,000 therefor, and Heinroth received the money and sent it to Mrs. Roth. F. H. Glade, representing the complainants here, and also representing the harbor company, called up Heinroth on the telephone, on either September 1st or 2nd, and told him that they had information that the Superior Court judgment of Mrs. Roth was to be used for purposes of redemption for the full amount of its face, and that they had reason to think that a large portion of it had been paid, and that they wished information on the subject; and that said judgment creditors and the harbor company also were ready to pay all that remained due on that judgment. Heinroth refused to give any information. This is established by a preponderance of the evidence, as Van Vlissingen, the president of the harbor company, was present with Glade, and heard the conversation at his end of the 'phone, and testified contradicting Heinroth's version. Prior to the advent of Husak, Mrs. Roth (presumably through her agent Heinroth, as some of the money used was obtained from Heinroth's sister) had, on August 13, 1903, the last day but one for redemption, paid the sheriff of Lake county $12,330.35, the amount required to redeem from the Jones sale, and the sheriff then had advertised the premises for sale on September 5, 1903, at the court house in Waukegan, under a further levy under the Roth execution. The steps taken by Novak to induce Husak to take an assignment of the judgment were after the premises had been advertised for sale under the Roth execution. On Saturday, September 5th, the sale was held. Novak attended, and Husak went with him, carrying $2,-000 more in money, and Westwood attended, representing Underwood, an attorney who was unable to be present and who professed to represent Lawrence C. Moore. Underwood had been attorney for Heinroth and for various members of his family, including Mrs. Roth, and had had financial dealings with Heinroth, and had been his attorney in his capacity as receiver for the harbor company. Glade

and the president of the harbor company were present, and Glade read a notice, informing the spectators and bidders that Mrs. Roth's judgment in the Superior Court of Cook County had been largely paid and was being wrongfully used for a large amount in the redemption. The sheriff proceeded with the sale. The first bid was the amount of the redemption. There were several succeeding bids. Novak claimed to have done most of the bidding, although Husak bid a few times. Novak testified he was bidding, not for Husak, but for H. Martin. Westwood bid $24,000 for Moore, and the premises were struck off and sold to him. Novak immediately offered to redeem the premises under one or both of two more executions against the harbor company in the hands of the sheriff. Glade offered to pay those two executions. The deputy sheriff insisted that none but the harbor company could pay them. Glade replied that he would pay them for the harbor company. Glade named the executions which he wished to pay, and the sheriff produced one, but declared he did not have possession of the other. Glade then went to the circuit clerk's office to find whether such an execution had been issued to the sheriff, and found it had been. The sheriff and Novak, Husak, Westwood and others, went up a back stairway into a jury room, and from there Novak and the sheriff and others went into the court room, which was locked, and there were doing the figuring necessary to complete the sale, and apparently were also arranging for a second redemption. Glade finally found the stairway, and went up and went into the court room, and then found, before the sheriff on the table, the execution for which he was searching. Glade then paid that. The sheriff then announced that it was so late in the day that he could not finish making out the papers until the following Monday, September 7th. On Monday, September 7th, Novak and Westwood again came from Chicago to Waukegan, and a certificate was made out to Moore; and Novak, for Martin, immediately deposited $24,000 with the sheriff, to redeem from the sale to Moore, under an execution in favor of the Illinois Brick Company

for $275.83 interest and costs, issued upon a judgment assigned to Cravens and by Cravens to Martin, and the sheriff re-advertised the premises for sale at a later date under that execution; and this bill was filed in time to enjoin that sale. The sheriff, Novak, Westwood and others gave testimony for defendants tending to modify or explain away some of the facts above stated. But there were many other unusual circumstances surrounding the sale and redemption above referred to, besides those already mentioned. Moore had no interest in the subject-matter of his bid, and it was not his money which was to be invested. Moore lived in Florida, and was a planter there, and had a place of business in Chicago as a tea packer. He knew nothing about the harbor company's properties. He never was interested in any way in making this bid, or in its results. This was shown both by his statements to others and by his testimony in another cause. All he did was to loan the use of his name for that occasion, and apparently to draw a check for $24,000 after his bank account had in some way been fortified for that purpose. The $2,000 which Husak carried to Waukegan, he there handed to Novak, and Novak deposited in a bank there, and at a later date paid it back to Husak. Husak, on September 7th, receipted to the sheriff for $12,369.74, full redemption money due him, and the further sum of $11,436.30 on amount due him on the Roth judgment, or else Novak signed Husak's name to such receipts (for which Novak took w·itten authority from Husak), and yet all Husak in fact received out of t'at sale was the return of his $2,000 which he paid for the Roth judgment in August, and $250 profit. He testified that he expected that they would yet pay him $750 more, as Novak had promised him that he should make at least $1,000. Of the rest of the money for which he receipted or for which Novak receipted for him, he knew nothing, and did not handle it. On September 7th, Westwood delivered to the sheriff Moore's uncertified check on some Chicago bank for $24,000, and the sheriff indorsed that check to Husak and delivered it to Novak.

Novak gave his own check to the sheriff for $24,000 in payment of the redemption from the sale to Moore, and the sheriff indorsed that check to Westwood, who was there representing Underwood, who was the supposed attorney for Moore. Westwood and Novak went back to Chicago in the same train, and in the cars Westwood handed back to Novak his check which the sheriff had indorsed to Westwood for Moore, and Novak handed back to Westwood Moore's check, which the sheriff had indorsed to Novak. Apparently the results of the sale were wiped out in that way. When Novak, Heinroth and Underwood were interrogated on the question whom they really represented, and who was back of Moore's name, and who was back of Martin's name, there was a unanimous and positive refusal to answer, until they were afterwards compelled by the court as to the persons back of Martin. It then turned out that Novak had organized a syndicate, composed of himself and his brother and another relative and some other parties, for buying this property at this sale and to endeavor to get the title, and that he had obtained permission to use the name of H. Martin, who had no interest in the transaction, and that Underwood was acting for some undisclosed parties who had a similar project in mind. He admitted Moore had no interest, and refused to state for whom Moore's bid was really made. The property was supposed to be worth $60,000, and the evident purpose was to redeem it at so high a figure that the complainants, most of whose judgments and executions were for small amounts and under $1,000, could not afford to redeem, but would be driven to abandon their claims. While the proposition by Husak to Mrs. Roth was not only for the payment of $2,000 in cash, but also for the payment of the further sum of $12,330.35 absolutely, either in five years if he got the property, or within thirty days if he did not get the property, yet Mrs. Roth's answer in this case, filed by another attorney, says she sold the judgment to Husak for $2,000, which would be a natural and reasonable sum to be asked and received for an assignment

of the judgment, if there was in fact, within the knowledge of all the parties, only a little over $2,200 remaining unpaid thereon.  Moreover, Heinroth in his examination as a witness, when his attention was not closely confined to the subject, spoke several times of this judgment as sold to Husak for $2,000.  Again, at each of the trials upon Mrs. Roth's notes, in the Circuit Court in Kenosha, in the Superior Court of Cook County, and in the Foley foreclosure suit before the master in Lake county, Mrs. Roth's attorney did not file or leave the notes upon which those several recoveries were had, but withdrew them.  Baldwin, Mrs. Roth's attorney in two of said cases, testified that he remembered to whom he delivered them, but after earnest and repeated objections by counsel for plaintiffs in error he was induced to decline to answer without the consent of his client.  It is obvious that if they had not been delivered to Heinroth or Novak, or to some one acting in their interest, these strenuous objections would not have been made.  Husak was not consulted about the various manipulations that were made with the two large sums for which he receipted to the sheriff, nor did he appear to know anything about the receipt which Novak obtained from him under date of April 4, 1904, for $8,391.07 recited to be the balance paid by the sheriff of Lake county on his judgment against the harbor company.  It is obvious that Husak loaned his name and the use of $2,000 in aiding Novak to make the deal which he was contemplating for his syndicate, and that Husak received $250 for the use of his money, and expected to receive $750 more; that Moore and Martin were mere names used by permission, but that they knew nothing about the property, had no desire or intention to make any investment therein, and that their names were cloaks for parties who were only partially disclosed, and then only under compulsion.  Complainants had no right to a disclosure of the names of strangers to these proceedings, but those undisclosed parties must be held bound by the knowledge their agents had.  Moore consented to receive a redemption from his bid, and his interest then

ended. Novak represented the syndicate which used Martin's name, and Martin and that syndicate are bound by what Novak knew.

Defendants introduced testimony having a tendency to explain or mitigate many of these circ. mstances; but we think the proof warranted the conclusion that Heinroth and Novak were acting in collusion, with knowledge that the Roth notes were largely paid; that Mrs. Roth and Husak were bound by the acts of Heinroth and Novak; that the purchase by Cravens of the judgment of the Illinois Brick Company and his assignment of it to H. Martin, upon which judgment for $275.83, as a basis, $24,000 redemption money was ostensibly paid on September 7, 1903, was really a purchase by Heinroth, in whose office Cravens had office room without compensation except such services as he might render Heinroth; that the Roth judgment was used at an untrue amount for a fraudulent purpose; and that Moore and Martin were not innocent purchasers whose rights should have been protected, but that they had no actual interest in the transactions.

Plaintiffs in error contend that a motion in the case of Roth v. Winthrop Harbor and Dock Company would have procured the reduction of Mrs. Roth's judgment, and that defendants in error were not entitled to any other relief. The proof warrants the conclusion that, though defendants in error had ascertained enough to make them believe that the Roth judgment had been largely paid, yet they were not possessed of the proofs which made it certain that such was the fact or which would enable them to prove it, till after September 7, 1903. The notes themselves had not been left in either of the courts where used in evidence, but had been withdrawn from each case in which they were offered. That they were purposely kept concealed is indicated by the strenuous objections to letting Baldwin tell to whom he delivered them. The master in chancery had not made his report in the Foley foreclosure case, and it had not been approved, and the master informed complainants' solicitor that he had not yet prepared his report, so that

source of information was not fully opened. Researches were required in Kenosha, Waukegan and Chicago. It was necessary to ascertain whether or not these suits were partly based on other notes issued by the harbor company and bought up by Mrs. Roth. Application to Heinroth, who undoubtedly knew the facts, was met with a refusal to furnish any information. Complainants were unable to find the original notes upon which the several recoveries by Mrs. Roth were based. Under these circumstances defendants in error were not guilty of laches in failing to make a motion in a court of law on or before September 7th. On that day an ostensible distribution of the proceeds of the sale and second redemption was made, and third persons, not parties to the record in any of the suits, were made ostensible parties in interest; the subsequent exchange of checks and many other facts now appearing in evidence were not then known to defendants in error; and we think no adequate and complete relief could thereafter have been had by motion in a court of law. If the sheriff had been stopped before he had paid out the $24,000, by cross delivery of the checks, already described, and had been compelled to bring the money into court on the Roth execution, and that judgment had then been reduced, still defendants in error could then have asked only that the remaining money be paid on the judgments in the order in which they became liens, and this record shows that at least one judgment was a lien prior to any of those owned by defendants in error, and for aught this proof shows there may have been many more; and in any event defendants in error would have received only partial satisfaction by such distribution. On the other hand, if Heinroth and Novak had caused the Roth execution to be used in redeeming from the Jones sale only for the amount then actually due, the total amount required to clear off that judgment or to effect another redemption would have been under $15,000, and defendants in error could have protected themselves by bidding at that sale or by another redemption, at an expenditure of over $9,000 less than was required to redeem

from the sale under the inflated judgment. Defendants in error might have means enough to be able to protect their interests in the one case and not in the other. At any rate, before defendants in error became fully advised of the facts, the most important of which had been purposely concealed from them by Heinroth, the money ostensibly paid to redeem from the apparent sale to Moore had been apparently paid to Mrs. Roth on her inflated judgment, and the secret exchange of checks had been made; and we think under such circumstances equity only could furnish adequate relief.

The decree enjoined a sale under the Martin redemption; set aside the sale to Moore; reduced Mrs. Roth's judgment to $2,297.60, decreed to be due thereon on September 5, 1903; awarded the costs against Roth, Heinroth, Husak, Martin and Novak; directed a special master (the regular master having been of counsel in this case in the court below) to advertise the premises for sale; ordered that there should be considered as bid at such sale by Husak the amount of the redemption money paid by Mrs. Roth on August 13, 1903, $12,330.35, with interest thereon at six per cent. per annum from the date of redemption to the date of sale, together with the costs of such sale; that the complainants (except Glade, who was forbidden to bid, because he made a bid at the sale on September 5, 1903) be required to raise said bid, and to bid at said sale and pay the special master a sum at least equal to the amount due Husak as assignee of Mrs. Roth and the costs of such sale, to wit: such redemption money paid by Mrs. Roth and the interest thereon plus the amount actually due on her judgment assigned to Husak, and interest thereon, and costs of sale; that upon failure of complainants or some of them or some other person to make such bid and pay such money, then no sale should take place, and the decree should be deemed of no effect, and should be vacated, and the injunction dissolved and the bill dismissed. It then provided for the distribution of the proceeds of the sale, if made, and for a certificate of sale to the purchaser, and for redemption within sixty days, and for a deed if redemption was not made.

Roth v. Burnham.

It is argued that this decree does not properly protect the parties. The cause was referred to the special master to take and report the proofs with his findings on the law and the facts. After his report had been prepared objections were filed thereto by complainants, and by defendants Heinroth, Cravens, Martin, Novak and Mrs. Roth. These were overruled by the master, and his report and said objections were filed in court, and afterwards an order was entered that said objections be treated as exceptions to the report in court. Those exceptions were overruled. Moore, Husak and Powell did not object or except to said report, and therefore cannot complain of so much of the decree as is based upon said report. As already stated, though we granted leave to make Husak and Moore plaintiffs in error, they have not joined in the assignments of error, nor has any severance of plaintiffs in error been requested. The assignments of error are specially confined to Mrs. Roth, Heinroth, Martin and Novak. We are of opinion that their interests are properly protected by said decree. The proof shows that Martin has no personal interest in the transaction, and merely permitted others to use his name. Novak was one of the persons he permitted to use his name, and was agent for the rest of that syndicate, and was a party to the fraud, and his fraud is binding upon his principals, disclosed or undisclosed. Mrs. Roth or her assignee Husak is protected under this decree for all that was paid to redeem from the Jones sale and for all that is due under the Roth judgment. Heinroth has no disclosed interest affected by the decree. The exchange of checks and other unusual acts shown herein leaves it uncertain whether any of the $24,000 has passed beyond the control of Novak. Novak obtained from Luella Heinroth, a sister of W. C. Heinroth, some money for alleged use in making these redemptions, and gave her a writing in which he agreed to hold the certificate of sale for her security, and it is argued she should have been protected by the decree. There is no certificate of sale outstanding; Luella Heinroth is not a party to this suit and is not complaining

of this decree, but so far as appears may be content to rely upon the writing Novak gave her; and no pleading set up any such agreement or asked any relief or protection in relation thereto.

The decree is affirmed.

*Affirmed.*